THE GALENA AND CHICAGO UNION RAILROAD COMPANY, Garnishee, etc., Appellant, *v.* WM. MENZIES, Appellee.

DAVID R. MARTIN, and LUCIEN D. COMAN, Appellants, *v.* THE SAME, Appellee.

### APPEALS FROM COOK.

Money of a corporation which has been, in advance of its being earned, set apart by its board of directors to the payment of interest on its bonds, secured by mortgage or trust deed on its road and franchises, and to raise a sinking fund for their redemption, is not subject to garnishee process issued by a judgment creditor of said corporation.

Where a corporation had given a mortgage or trust deed of all its property, tolls, incomes, franchises, etc., to secure the principal and accruing interest on its bonds, its revenues so pledged are not liable to a garnishee process by its judgment creditors, after the execution by it, of such mortgage or trust deed.

9

WILLIAM MENZIES sued out a writ of attachment against the estate, real and personal, of the Mineral Point Railroad Company, with a summons to the Galena and Chicago Union Railroad Company to appear and answer, as garnishee of the defendant, returnable on the third Monday of November, 1858. The writ was returned without service as to the defendant, but duly served on the garnishee.

The plaintiff filed below his allegations and interrogatories to be answered by the garnishee in substance, as follows:

Allegations—That the garnishee had in its possession, custody, or charge, at the time of the service of process upon it, goods, chattels, moneys, credits, property and effects to a large amount belonging to defendants or in which the defendant was interested; and that the garnishee, at the time of service, was also largely indebted to the defendant.

Interrogatories—1. Whether the garnishee had, at the time of the service of process, or at any time thereafter, any goods, chattels, moneys, credits, property or effects, in its possession, custody, or charge, belonging to defendant or in which the defendant was or is interested. If yea, state the amount, etc. 2. Whether the garnishee was, at the time of the service of said process, or at any time thereafter, indebted to the defendant in any manner. If yea, how, in what amount, etc.

The answer of the garnishee was filed on the 21st day of March, 1859, and therein the garnishee states: That on the 10th day of October, 1853, a contract in writing was entered into between the Galena and Chicago Union Railroad Company and the Illinois Central Railroad Company of the one part, and the Mineral Point Railroad Company of the other part, respecting the completion of the Mineral Point Railroad and its operation in connection with the Galena and Chicago Union Railroad and the Illinois Central Railroad, for a period of twenty years, so that the business of the said roads should be, so far as the same could be properly controlled, mutually beneficial to the said parties; a copy of said contract is attached to and made part of the answer, as "Exhibit A."

That the Mineral Point Railroad was completed sometime in the Spring of 1857, since which time the Galena and Chicago Union Railroad Company have been operating in connection with said Mineral Point Railroad, and exchanging business with them under said contract; and that there was owing to the Mineral Point Railroad Company, or its assigns, under said contract, at the time of the service of process in this case, about $10,000; and that on the date of the answer the amount was somewhat larger; all of which indebtedness accrued in the course of business transactions had between the parties under the contract.

All indebtedness otherwise than as above stated is denied, and the garnishee also denies having in its possession, charge, or control, at the time of the service of process, or subsequently, any goods, chattels, moneys, credits, or effects, belonging to the Mineral Point Railroad Company, or in which said company was or is interested.

The garnishee, further answering, says, that the plaintiff ought not, by reason of its indebtedness aforesaid, to have or recover a judgment against it; because the Mineral Point Railroad Company, on the 1st day of January, 1856, by its deed of that date, duly executed, acknowledged and delivered, granted, bargained, sold, transferred and conveyed to David R. Martin and Lucien D. Coman, of New York, their successors and assigns, the railroad of said company, constructed and to be constructed, from Mineral Point, Wisconsin, to Warren, Illinois; together with all and singular the property, real and personal, tolls, income, issues, properties, rights, credits, and franchises, pertaining to said railroad;—To have and to hold the same unto the said Martin and Coman, their successors and assigns, upon the trusts in said deed declared, which deed was duly recorded in the recorders' offices of Iowa and Lafayette counties, Wisconsin, and Jo Daviess county, Illinois; these being the counties through which said road was laid out and constructed or in process of construction.

The answer further states, that the Mineral Point Railroad Company, afterwards, and on the 16th day of June, 1857, in pursuance of a covenant of further conveyance and assurance in said deed contained, did, by its certain other deed duly executed, acknowledged and delivered, grant, bargain, sell, transfer, release, quit-claim, convey and confirm unto said David R. Martin and Lucien D. Coman, the trustees in said deed named, and to the survivor of them, his successor or successors in said trust, all and singular the corporate property, tolls, income, issues, profits, rights, credits and franchises in said former deed mentioned or referred to; also all property acquired by said company subsequently to the date of said first deed;—To have and to hold the same unto the said Martin and Coman, and the survivor of them, his successor, etc., in trust, and assigns, upon the trusts declared in said former deed, and especially for the benefit and security of the holders of certain bonds in said first deed described, to wit, 640 bonds of said Mineral Point Railroad Company, each for $500, all dated the 1st day of January, 1856, which bonds are not yet due and are still outstanding and unpaid, in the hands of *bona fide* holders; which said last mentioned deed was also duly recorded in the counties

aforesaid, and copies of said deeds are attached to and made part of the answer as "Exhibits B and C."

The answer further states that the garnishees knew of the execution of these deeds before the service of process on them; and that they are advised and believe, that by said deeds all the indebtedness aforesaid, accrued and to accrue, from them to the Mineral Point Railroad Company, and all claims of the Mineral Point Railroad Company, for per centage or otherwise, against said garnishees, growing out of said contract and the performance of it, were transferred and assigned by the Mineral Point Railroad Company to said Martin and Coman, in trust for the purposes set forth in said deeds. And the garnishees say that they are informed and believe, that said Martin and Coman, as trustees as aforesaid, claim all and every part of the indebtedness aforesaid under and by virtue of said deeds, and all indebtedness of said garnishees, accrued and to accrue under said contract. And they submit that said Martin and Coman, and not the Mineral Point Railroad Company, are entitled to have and receive the same; and that the said plaintiff ought not to have or recover a judgment for said indebtedness, or any part thereof. And they pray to be discharged, with their costs, etc.

Exhibit A, attached to foregoing answer, is a contract, dated October 10th, 1853, between the Mineral Point Railroad Company of the first part, and the Galena and Chicago Union Railroad Company, and the Illinois Central Railroad Company, of the second part, and is in substance as follows:

The party of the first part covenants and agrees to construct, and equip with a sufficient amount of rolling stock to transact its business, a good and substantial single track railroad from Mineral Point, in Wisconsin, to and intersecting the Illinois Central Railroad at or near Warren, Jo Daviess county, Ill., within two years from this date; the rails used to be T rails, and the work to be done in a substantial manner.

The party of the first part further covenants and agrees, that for the period of twenty years from 1st day of January next, it will transport all the freight which shall pass in a southerly direction over the Mineral Point Railroad, or any part of it—so far as it shall have the legal right to control the destination of such freight—to the Illinois Central Railroad at or near Warren; and that it will, during that time, by giving through tickets to passengers, and by the exercise of all legal means, transport passengers going southerly on said Mineral Point Railroad, or any part of it, to the Illinois Central Railroad; and that it will at all times so regulate its tariff of charges for freight and passengers as to throw all the business of the Mineral Point Railroad, in both directions, upon the roads of the parties of

the second part, so far as the same may be legally practicable. The party of the first part also covenants and agrees that it will not, during the said twenty years, enter into any contract with any other railroad company in reference to the transportation of freight or passengers, without the consent of the parties of the second part.

The parties of the second part covenant and agree that they will, during the term of twenty years aforesaid, pay to the said party of the first part, as hereinafter stipulated, such sums as will, in the manner hereinafter specified, secure to said first party a net annual income equal to eight per cent. per annum on the gross cost of its road and its equipments, including all incidental expenses, salaries, etc., *provided* such gross cost shall not exceed $700,000 ; said payments to be made semi-annually, at such times as the parties of the second part shall make up their accounts.

That to determine the amount to be paid by said second parties, the net earnings of the Mineral Point Railroad, resulting from the business done exclusively upon it, shall be first ascertained, and to ascertain that, all incidental expenses of operating the road and of repairs shall be deducted from its annual gross receipts ; and it is agreed that said expenses and repairs shall no tin the whole exceed fifty per cent. of the actual gross receipts ; that in addition to the sum so received by the first party from the net earnings of its road, the parties of the second part shall semi-annually pay, as aforesaid, to said party of the first part, such a proportion or per centage of the gross amount received by the said companies respectively composing said party of the second part, for the transportation of freight and passengers which shall pass from the Mineral Point Railroad over the Central Railroad, or over the Galena and Chicago Union Railroad, or which shall pass from said roads, or either of them, over the Mineral Point Railroad or any part of it, as will, when added to the net earnings of the Mineral Point Railroad, to be ascertained as aforesaid, amount to eight per cent. per annum on the aforesaid gross cost of said Mineral Point Railroad—said cost not to exceed $700,000, as aforesaid.

*Provided, however,* that this contract shall in no event involve the party of the second part in the payment of more than thirty per centum on the aforesaid receipts from the transportation of freight or passengers to or from the Mineral Point Railroad, as aforesaid.

It is further agreed that the parties of the second part shall not pay to the party of the first part any proportion or per centage of its receipts, arising from the transportation of freight or passengers passing over the Illinois Central Railroad, or the

Galena and Chicago Union Railroad, to or from the Mineral Point Railroad, which shall go to, or come from, any point on the Mineral Point Railroad, within eight miles of the Illinois Central Railroad.

The said party of the first part further covenants and agrees, that it will at all times, during the term of twenty years aforesaid, keep and maintain as high a tariff of charges for transportation of freight and passengers, as the average rates charged by said parties of the second part on the same freight and passengers.

It is further stipulated between the said parties, that either party shall be allowed to have freight transported on their own cars over the road of the other party; and that said party shall be entitled to a reasonable compensation for the use of its cars; each party repairing the damages to cars that occur on its own road.

It is further stipulated by and between the parties, that the stipulations herein contained, providing for payment of per centage on freight and passengers by the parties of the second part to the parties of the first part, shall only apply to one hundred and twenty miles of the road of the Illinois Central Railroad Company, from the point of junction with the Illinois Central Railroad.

Exhibit B, of answer, is a deed, dated January 1st, 1856, made between the Mineral Point Railroad Company, " a corporation duly constituted by the laws of the State of Wisconsin," party of the first part, and D. R. Martin and L. D. Coman, of the city of New York, parties of the second part; and recites that the Mineral Point Railroad Company, in the performance of its corporate powers, are now engaged in constructing a railroad from Mineral Point, Wisconsin, to Warren, Jo Daviess county, Illinois; for that purpose, in part, have resolved to raise a sum of money by loan, for the purpose of purchasing iron rails and machinery therefor, and of aiding in the construction of said railroad, and putting the same into operation, and for the objects and purposes aforesaid; and in order to secure the payment and satisfaction of the moneys to be raised as aforesaid, it is proposed and intended, by said party of the first part, to execute, issue and deliver 640 bonds, or writings obligatory, each for the sum of $500, to be numbered respectively from 1 to 640, inclusive; which bonds are of even date herewith, and in the following form:

No..... UNITED STATES OF AMERICA—STATE OF WISCONSIN.   $500.

MINERAL POINT RAILROAD COMPANY.

Convertible Mortgage Bond, secured on all the road and

property, and by a special annual income of $56,000 guaranteed jointly by the Illinois Central and the Galena and Chicago Union Railroads, as per articles of agreeement dated October 10, 1853.

Know all men by these presents, that the Mineral Point Railroad Company are indebted to D. R. Martin and L. D. Coman, of the city of New York, or bearer, in the sum of five hundred dollars, lawful money, etc., which sum said company agree to pay to Martin and Coman, or bearer hereof, on the 1st day of January, 1881, at the Bank of Manhattan Company, in the city of New York, with interest at eight per cent., payable semi-annually, at said bank, on the first days of January and July in each year, on presentation and surrender of annexed coupons as they become due ; and in case of non-payment of interest for any half year, and the same remaining in arrears for sixty days, the principal to become due and payable.  The company also agree at any time within ten years to transfer to the holder hereof, at his election, five shares of the stock of said company, upon the surrender of this obligation and the unpaid coupons. This is one of a series of bonds of like tenor and date, executed and issued in conformity with resolutions of the board of directors of said company, passed September 5th, 1855, authorizing bonds to be issued to the amount of $320,000, and the holder is entitled to the security of a mortgage, dated January 1st, 1856, upon the company's line of road, depot grounds, etc., executed and delivered to said Martin and Coman in trust, to secure payment of principal and interest on said bonds, and duly recorded in the counties through which said road passes. The holder hereof is also entitled to the benefit of a sinking fund of $5,400 per annum, to be set apart annually from the "guaranteed income" of said company, as provided for in said mortgage, being sufficient to redeem the whole $320,000 sesured by said mortgage, within twenty-five years from the date of said bonds, and before they become due.

This bond not to be valid until the certificate hereon is signed by the said trustees or their successors.  This bond may pass by delivery, or may be registered on the books of the company by the holder, and then no transfer shall be valid unless registered, etc.

In witness whereof, the said company, etc.

This is to certify, that the Mineral Point Railroad Company have executed to us a deed of trust, or mortgage, conveying the entire line of road, etc., with all its appurtenances, in trust for the benefit of the holders of their bonds, like the within, to be issued to an amount not exceeding $320,000, with power to take possession of all or any part thereof, and use or sell the same, after a default in paying the interest or principal of said

bonds, or any payment to the sinking fund; that the within is one of several bonds secured by said deed, and that said deed has been recorded in the proper counties, etc.

———, } *Trustees.*
———, }

And whereas the said company are of the opinion that said bonds, amounting to $320,000, would be made more valuable and available by creating an additional security therefor, by means of a sinking fund, to be established for that purpose, by setting apart annually $5,400, being part of the $56,000 guaranteed as an annual income by the Galena and Chicago Union Railroad Company and the Illinois Central Railroad Company to the Mineral Point Railroad Company, which sum of $5,400, together with accumulations of interest, will be sufficient to pay the principal and interest of said bonds at maturity thereof, "the said sinking fund above referred to was by resolution of the said board of directors irrevocably set apart, and appropriated for the purpose, and in the manner above specified."

Now, therefore, this indenture witnesseth, that the said Mineral Point Railroad Company, in consideration of the premises, and in order to secure the payment of the said bonds and interest thereon accruing, and in consideration of one dollar paid to the said company by said parties of the second part at and before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, have granted, bargained, sold, transferred and conveyed, and by these presents do grant, bargain, sell and convey to the said parties of the second part, their successor or successors in the trust hereby created, all their said road from the village of Mineral Point, Wisconsin, to the village of Warren, in the State of Illinois, being thirty-two and two-thirds miles of road constructed and to be constructed, together with all and singular the railways, land procured or occupied for right of way, together with bridges, fences, privileges and real estate owned by said company for the purposes of said road, or which may hereafter be acquired or owned by them, and all tolls, income, issues and profits to be had from the same, and all lands used for and occupied by depots or stations, with all buildings standing thereon, or which shall be procured therefor, together with all locomotives, engines, tenders, passenger cars and freight cars, shops, tools, and machinery now owned or hereafter to be acquired by said company, and in any way belonging or appertaining to said railroad, now constructed and to be constructed, including all its property, real and personal, pertaining to said railroad, and all its rights, credits and franchises thereunto appertaining; but nothing herein contained shall be so construed as to prevent the said party of the first

part from selling, hypothecating or otherwise disposing of county or town bonds, or other securities received in payment of stock or otherwise, or of any lands or other property of said company not necessary to be retained for the construction or convenient use of their railroad, nor from collecting moneys due said company on stock subscriptions, or otherwise ; nor shall anything herein contained be so construed as to prevent the said party of the first part from collecting and appropriating towards the construction, use and repair of their said road ;

To have and to hold the said premises, etc., unto the parties of the second part, their successors, etc., upon the following trusts, that is to say :

"In case the said party of the first part shall fail to pay the principal, or any part thereof, or any of the interest on any of said bonds at any time when the same may become due and payable, according to the tenor thereof, when demanded ; or in case the said company shall, for and during any one year, until the said sum of $320,000, together with the interest thereon, shall be fully paid and satisfied, neglect or fail to pay to the said sinking fund the said sum of $5,400, then, after such default in the payment of any part of said principal or interest, or any part of said sum, to said sinking fund, and the same remaining in arrear, then, upon request of such bondholders, the said parties of the second part, their successors in said trust, or assigns, may enter into and take possession of all or any portion of said premises, and, as the attorneys in fact, or agents of the said party of the first part, by themselves, or agents, or substitutes, have, use and employ the same, making from time to time all needful repairs, alterations and additions thereto ; and, after deducting the expense of such use, repairs, alterations and additions, apply the proceeds thereof to the payment of the principal and interest of all said bonds remaining unpaid, and to the supplying of any deficiency in the said sinking fund,"—or said parties of the second part, upon written request of the holders of at least one-half of said bonds, shall cause said premises to be sold at public auction, in New York city, after giving forty days' notice of said sale, etc., and execute deeds to the purchasers for the said premises, which shall be a bar to all interest of said party of the first part, their successors and assigns therein ; and the said trustees, after deducting expenses, etc., to apply proceeds of said sale, or so much as may be necessary towards payment of the principal and interest due or unpaid on said bonds, and supplying any deficiency in said sinking fund, rendering the balance to party of the first part.

Stipulation that no advantage shall be taken of any appraisement, valuation or extension laws by first party, and that no

injunction or stay of proceedings shall be applied for or obtained to prevent such entry or sale as aforesaid.

" And said party of the first part hereby covenants, for the consideration aforesaid, to execute and deliver any further reasonable and necessary conveyance of the premises, or any part thereof, to the said parties of the second part, their successors or assigns, for more fully carrying into effect the objects hereof," and particularly for the conveying of property acquired by said first party subsequently to the date of this deed.

" And said party of the first part hereby further covenants, as aforesaid, that the money borrowed for the purpose aforesaid, upon the security of said bonds, shall be faithfully applied to the purchasing and the transportation of iron rails and machinery, and for the construction and extension of said road, and the expenses attending such loan and purchase ; and that said rails and machinery so purchased shall be transported and used with due diligence in the construction, finishing and furnishing of said railroad."

On payment of the principal and interest of said bonds, or the conversion thereof into stock, the estate granted to the parties of second part to be void, and the right to said premises to revert to and revest in the party of the first part.

Mutually agreed that the parties of the second part shall only be accountable for reasonable diligence in the management of the trusts aforesaid ; and that they shall not be responsible for the acts of any agent employed by them, when such agent is selected with reasonable care.  And the said second parties shall be entitled to receive proper compensation for the trouble, etc., in case they have to take possession of said premises under this deed.

And it is provided, that in case of the death, incapacity, or resignation of said parties, the estate hereby granted, and the trusts created, shall vest in and devolve upon, such person or persons, residing in the city of New York, as the Supreme Court of Wisconsin, upon application, shall appoint.

The foregoing deed is duly executed by the Mineral Point Railroad Company, under its corporate seal, and acknowledged by Parley Eaton, as president of the company, April 18th, 1856, before the clerk of the Circuit Court of Iowa county, Wisconsin, and was on the same day recorded in said county.

Exhibit C, of garnishee's answer, is a deed made June 6th, 1857, between the Mineral Point Railroad Company, of the first part, and David R. Martin and Lucien D. Coman, of New York city, of the second part.  It recites the execution of Exhibit B, its record in the register's office of Iowa county, Wisconsin, on the 18th day of April, 1856, in the register's office of Lafayette

county, Wisconsin, April 21st, 1856, and in the recorder's office of Jo Daviess county, Illinois, April 25th, 1856—the purposes for which the same was executed; and sets forth, by way of recital, the entire granting clause of that deed, with a full description of the property conveyed by it; also, the clause against so construing that deed as to prevent the company from selling or hypothecating county or town bonds, or other securities received in payment of stock, or lands, or other property not needed for the purposes of its road, or from collecting moneys due on stock subscription, etc. Also, the covenant for further conveyance and assurance contained in said deed; and the fact that since the maturing of said deed, the company have been engaged in constructing and equipping its road, and have also acquired certain machinery and rolling stock for the road, and then in use upon it. And then proceeds in substance as follows:

Now this indenture witnesseth, that in compliance with said covenant, for further assurance, and in pursuance of a resolution of the board of directors of the company, dated June 6th, 1857, authorizing the execution of said deed, and in consideration of one dollar, etc., the said party of the first part "hath granted, bargained, sold, transferred, released, quit claimed and conveyed, and by these presents doth grant, bargain, sell, transfer, release, quit claim, convey and confirm, to said parties of the second part, trustees in said indenture of mortgage, and to the survivor of them, his successor and successors in said trust, all and singular the corporate property, tolls, incomes, issues, profits, rights, credits and franchises, in said indenture of mortgage mentioned or referred to. Also, the locomotives, passenger cars, and freight cars, herein above mentioned, and particularly, all the property acquired by said party of the first part subsequently to the date of said indenture of mortgage, and comprehended in the description contained therein." To have and to hold, etc., upon the trusts created and declared in and by said indenture of mortgage, and especially for the benefit and security of the holders of the bonds therein mentioned.

And it is further witnessed and declared by said parties to these presents, that the declaration in said indenture of mortgage quoted in the above recital, does not express their true intent and meaning, but that it was the design and intent of said parties in executing said indenture, that said parties of the first part should not, and it is hereby declared and agreed that said party of the first part shall not be permitted to sell, hypothecate, or dispose of, any part of the property or effects mentioned in said indenture of mortgage, except upon the condition that said company shall diligently proceed to collect and apply all means that may be acquired by such sale, hypothecation, or

disposition, to the construction, or repair and improvement of its said railroad. And provided, also, that no default shall be made in the payment of the interest or principal of any of the bonds in said indenture of mortgage described ; and that said indenture of mortgage shall be so read and construed.

"And it is further witnessed, declared and agreed, by and between said parties hereunto, that nothing in said indenture of mortgage contained, shall be so construed as to prevent said parties of the second part, their successors in said trusts, or assigns, from entering into, and taking possession of, said mortgaged premises, and the proceeds thereof, immediately after said party of the first part shall fail to pay the principal, or any part thereof, or any of the interest on any of said bonds, at any time when the same may become due and payable according to the tenor thereof, when demanded ; nor from selling said mortgaged premises, or so much thereof as shall be necessary to discharge the principal and interest of said bonds in arrear, when requested by the holders thereof, as provided in said indenture of mortgage."

It is further mutually agreed that upon a sale of said premises for the payment of the principal or interest of said bonds, that such part of said premises as are or may be within the States of Wisconsin or Illinois, shall be sold in such manner as may be authorized by the laws of those States respectively, anything in said indenture of mortgage to the contrary notwithstanding ; and that the said trustees, or either of them, may at such sale buy in said premises so sold, for the account of all the holders of said bonds then unpaid and unconverted into stock, for any price at which the same may be struck off, not exceeding the amount owing upon said bonds, and the costs and expenses of sale, and hold the same for the benefit of said bondholders, as may be authorized by law—the interest of said bondholders in said premises so purchased to be in proportion to the amount due upon the bonds held by them respectively ; and then follows a covenant on the part of the company, for such further conveyance and assurance as the said parties of the second part, or their counsel, shall reasonably desire, advise or require, for the purpose of effecting the objects and purposes of said indenture.

The foregoing deed was duly executed and acknowledged before the clerk of the Circuit Court of Iowa county, Wisconsin, on the 6th day of June, 1857.

May 12th, 1859, David R. Martin and Lucien D. Coman filed in said court their interpleader, claiming the property, money, rights, credits and effects sought to be recovered by the plaintiff below, under the garnishee process issued in said cause and served upon the Galena and Chicago Union Railroad Company,

and alleging in substance that they, the said Martin and Coman, and not the said Mineral Point Railroad Company, are the owners of the property, money, rights, credits and effects sought to be recovered by the plaintiff under said garnishee process.

The plaintiff below filed his replication to the answer of the garnishee, as follows:

That at the time of the service of process on the garnishee, it had in its possession, custody and control, moneys and effects belonging to the Mineral Point Railroad Company, and was indebted to the Mineral Point Railroad Company in about the sum of $10,000. That the deed mentioned in the answer did not convey to Martin and Coman any interest in the said sum and sums of money in the hands of the garnishee under the contract referred to in said answer; nor did said deed convey to or vest in said Martin and Coman, or either of them, any interest in or right to any indebtedness from the Galena and Chicago Union Railroad Company to said Mineral Point Railroad Company; and the plaintiff denies the allegations in said answer relating thereto.

That the Mineral Point Railroad Company did not, in pursuance of a covenant for further assurance, by deed in said answer alleged to have been made on the 6th day of June, 1857, nor in any other manner, transfer or assign to said Martin and Coman, or either of them, the indebtedness accrued and to accrue from the said garnishee to the Mineral Point Railroad Company, or any part thereof, growing out of the said contract referred to in said answer. And the plaintiff denies all the allegations of said answer respecting said deed and the effect thereof, and alleges that no part of the indebtedness of the garnishee to the Mineral Point Railroad Company for moneys received by the garnishee, under the contract aforesaid, was conveyed, transferred or assigned to said Martin and Coman, or either of them, but that the same remained and was property of the Mineral Point Railroad Company, who had the right to demand, have and receive the same from the garnishee under and by virtue of the terms of the contract referred to, and that the said Martin and Coman had and have no right whatever to demand, have or receive the money owing by garnishee to the Mineral Point Railroad Company under said contract.

That the deeds in the said answer alleged to have been made by the Mineral Point Railroad Company to Coman and Martin, were and are fraudulent and void, as to creditors of the Mineral Point Railroad Company.

The garnishee filed in said cause an additional answer in substance as follows:

That the Mineral Point Railroad Company has never at any

time paid the interest secured, or intended to be, by the deed in the former answer set forth. And that at the time of the service of the garnishee process a large amount of said interest was in arrear and unpaid, and ever since so continued.

That in January, 1856, and prior to the actual delivery and sale of said bonds, the board of directors of said Mineral Point Railroad Company passed and caused to be entered upon the records of their proceedings a resolution as follows:

"Resolved, that the income of $56,000, guarantied by the Galena and Chicago Union Railroad Company, and the Illinois Central Railroad Company, be and the same is hereby irrevocably pledged, as follows, viz.: the sum of $45,600 to the payment of the interest on $320,000 of the first mortgage bonds; of $150,000 of the second mortgage bonds, held by the county of Iowa; and of $100,000 of the second mortgage bonds held by Alvan Wilkins; and the balance of $10,500 to be applied as a sinking fund, for the payment at maturity of the bonds, as follows, viz.: $5,400 to the first mortgage bonds; and $5,000 to the $100,000 of second mortgage bonds above specified as given to Alvan Wilkins."

That, as the garnishees are advised and insist, by the resolution and the bonds and deed of trust set forth in the former answer, not only was the interest upon said bonds to be paid out of the indebtedness of the garnishee and the Illinois Central Railroad Company, under their contract with the Mineral Point Railroad Company of 10th October, 1853, but the sum of $5,400 per annum was expressly and irrevocably set apart by said Mineral Point Railroad Company, as a sinking fund for the ultimate payment and redemption of the principal sum of $320,000 of the bonds aforesaid, secured or intended so to be by the said deed of trust.

That the whole accumulated indebtedness of the garnishee and the Illinois Central Railroad Company, under the contract of 10th of October, 1853, was, at the time of the service of the garnishee process, and at the time of the former answer, largely less than the amount of money required for the purposes of said sinking fund. That at the date of said service, the aggregate indebtedness of respondent and the Illinois Central Railroad Company was about $11,500, whilst the principal of said sinking fund amounted to upwards of $14,000. That at the date of said former answer, said indebtedness had not materially increased, whilst the principal of said sinking fund had increased to upwards of $16,000.

That the Mineral Point Railroad Company was, at the time of the service of the garnishee process, and ever since has been, in default, both in respect to said sinking fund and the payment

of interest on said bonds. The said resolution and the deed of trust, aforesaid, contain all the provisions respecting said sinking fund made by said company. And that the bonds aforesaid, amounting to $320,000, secured by said deed of trust, are the same bonds referred to in said resolution as " the first mortgage bonds," and that upon their face they purport to be secured by said deed of trust and said sinking fund.

That in consequence of the default of the Mineral Point Railroad Company, in the payment of interest, etc., said Martin and Coman instituted proceedings against said company and others, in the District Court of the United States for the District of Wisconsin, on the chancery side of said court, for the foreclosure of said deed of trust, and that such proceedings were had in said court, that afterwards, and at a special term of said court, begun and held on the first Monday of April, A. D. 1859, and on the 21st day of April aforesaid, George W. Cobb was by the order and decree of said court, appointed receiver of all and singular the property and effects of said company. That said Cobb duly qualified as such receiver, and on or about the 1st day of May, 1859, took possession of the road, property and effects of said company, as such receiver, and has ever since been in the possession and control of the same as receiver.

The replication to additional answer of garnishee, is in substance as follows :

The plaintiff denies each and every allegation in the additional answer contained, and alleges that no part of the interest on the bonds described in said answer was to be paid out of the indebtedness of the garnishee and the Illinois Central Railroad Company, under the contract referred to in said answer. And that the Mineral Point Railroad Company never appropriated said indebtedness to the payment of interest on the bonds mentioned in said answer. That the sum of $5,400 per annum was not, nor was any part thereof, in any manner set apart by said Mineral Point Railroad Company, as a sinking fund for the payment of the principal sum of $320,000, as stated in said answer, nor for any purpose whatever. But the plaintiff alleges that all sums of money and indebtedness accruing to the Mineral Point Railroad Company under said contract, have at all times been subject to the control and disposition and order of said company for its own uses, purposes and benefits ; and that the same was, at the time of the service of the garnishee process aforesaid, subject to the entire control, order and disposition of said company, and belonged to and was the property of said company.

The plaintiff filed his replication to the interpleader and claim of Martin and Coman in substance, as follows :

That the plaintiff, by reason of anything by said Martin and

Coman in their interpleader alleged, ought not to be barred from recovering the said property, rights, money, credits, and effects, or any of them, because he says that at the time of the service of the process, etc., the said garnishee had property, money, rights, credits and effects in its possession, belonging to the defendant, and was indebted to the defendant. And that the moneys, property, credits, and effects, sought to be recovered by the plaintiff under the garnishee process, belonged to and was the money, property, credits and effects of the defendant, the Mineral Point Railroad Company, and the same had not been, nor had any part thereof been sold, transferred or assigned to said Martin and Coman, or either of them, and they were not, nor ever have been, the assignees or owners of said property, money, rights, credits or effects, nor any portion thereof, in manner and form as said Martin and Coman have in their interpleader in that behalf alleged.

January 31st, 1861, cause came on for trial before a jury, and by agreement, all questions touching the legality or regularity of the interpleader of Martin and Coman are waived, and, by consent of parties in open court, the issues upon answers of garnishee and the interpleader of Martin and Coman are to be tried together.

The jury found that the garnishee has in its hands the sum of $11,164, and that the same was the property of the Mineral Point Railroad Company at the time of the service of process, etc., and subject to said process; that the amount of plaintiff's debt at this time was $8,929.26; and further that the interpleaders have no right to said money as against said plaintiff.

Motion for new trial by garnishee, and also by claimants, overruled, and judgment was entered on the verdict in favor of the Mineral Point Railroad Company, for use of plaintiff, against the garnishee, for $8,929.26 and costs, and against the claimants for costs.

Exceptions taken by garnishee and claimants respectively to the overruling of motions for new trial, and an appeal prayed by them, and allowed by consent of parties.

The bill of exceptions recites the consent of parties to the trial of the issues on the answers of garnishee and interpleaders together; the calling of the jury to try the issues, etc., and that the plaintiff, to sustain the issues on his part, read to the jury the answer of the garnishee as hereinbefore set forth.

*William M. Larrabee,* called for the plaintiff, testified as follows:

I am secretary of the Galena and Chicago Union Railroad Company. On May 1st, 1859, there was to the credit of the

Mineral Point Railroad Company, on the books of the Galena and Chicago Union Railroad Company, $11,164.10 ; this was the balance on hand as money balance, liable to be paid to the order of the Mineral Point Railroad Company at any time.

The contract of 10th October, 1853, between the Mineral Point Railroad Company, of the one part, and the Galena and Chicago Union Railroad Company, and the Illinois Central Railroad Company, of the other part, set out in answer of garnishee, was here shown to the witness, and offered in evidence and read to the jury ; and the witness testified, in answer to cross-interrogatories, as follows :

That contract of October 10, 1853, by agreement of all the parties to it, went into operation about the 1st July, 1857 ; and the whole indebtedness of the Galena and Chicago Union Railroad Company referred to by me, accrued under the provisions of that contract. There may have been some items of the account not exactly under the contract ; but such items were more than overbalanced by claims against the Mineral Point Railroad Company ; so that the whole debt properly accrued under the contract.

Here the plaintiff rested, and the garnishee and claimants, to sustain the issues on their part, introduced as a witness, *George W. Cobb*, who being sworn, testified as follows :

I first became connected with the Mineral Point Railroad Company in September, 1856. At that time the company hired me to take charge of some grading on the road. The road was not completed until July, 1857. Luther Beecher was the principal contractor with the company, to construct the road and furnish the rolling stock ; he had nothing to do with the grading. Mr. Beecher, by his contract, was to have possession of the road until the month of September, 1857. In February, 1857, Mr. Beecher requested me to take charge of the road under him ; I did so, until August or September, 1857, when Mr. Beecher came to me with a Mr. Nesbit, and told me to hold the road in spite of everybody. I was running the road during the summer of 1857, merely as agent for Mr. Beecher. The men were paid by Mr. Beecher out of the earnings of the road. I have been familiar with the road ever since. The Mineral Point Railroad Company, since then, has never had anything to do with the road ; it has never had possession of the road. I have been running it myself, under general order of Beecher, for trustees. In February, 1857, I was authorized and requested by the trustees, Martin and Coman, to put in an interpleader for them for some property on the road, which had been levied on by an attachment issued from the Circuit Court of Jo Daviess county, and to protect their interest. They sent me the original

deed of trust executed to them by the Mineral Point Railroad Company, and I have had it ever since.

Original of Exhibit B, attached to the answer of garnishee, shown to the witness, and identified as the instrument sent to him by trustees, Martin and Coman, and the same was then offered in evidence and read to the jury.

Witness then proceeded—I have power of attorney from the trustees, Martin and Coman, but not dated so far back. (Power of attorney produced and identified.) Prior to my receivership, I made my monthly reports to Mr. Beecher, with the expectation that he would lay them before the trustees. The money in the hands of the Galena and Chicago Union Railroad Company was earned whilst I was running the road. The Mineral Point Railroad Company never had anything to do with it. I held the road from August, 1857, under the general charge of Beecher, for the trustees. The Mineral Point Railroad Company made several attempts to get possession of the road from me, but never got possession. I never reported to the company. At the time of giving me instructions, Beecher was vice president of the company.

Cross-examination : I never requested the trustees to have me appointed receiver, or to take any proceedings in Wisconsin to recover possession of the road. I may have suggested the idea of foreclosing the deeds of trust, for the purpose of closing out the matter. Mr. Beecher is and has for three years been president of the company. Parley Eaton was president prior to that time, and Mr. Beecher, vice president. There was no change in the books used by me from the time Beecher had possession of the road, until I took possession of it as receiver. The business was done and all papers made out in the name of the company. I transacted the business in the name of the company until May, 1859, when I took possession as receiver. I have not the contract between Beecher and the company.

Re-examination direct : The railroad business up to the receivership was done in the name of the company. The power of attorney I received by mail from the trustees, or their attorneys in Wisconsin. I have corresponded with Mr. Coman ; I saw him in New York, in March, 1859, the next week after the power of attorney was sent, and had a conversation with him about the power.

I had been previously in possession of the road for the trustees, and in that conversation he approved of my acts whilst in my possession ; I was in possession of the road when I was appointed receiver, so that the possession was not in fact changed by the receivership. The parties, through Mr. Coman, requested me to attend to their interests.

The matter has not been entirely with Beecher prior to the receivership; I corresponded principally with Mr. Beecher; but little with the trustees direct.

The power of attorney from Coman and Martin to witness, Cobb, was offered and read in evidence, dated March 18th, 1859, and authorizing Cobb, as their agent and attorney, to protect and preserve the property described in and covered by its first mortgage of the Mineral Point Railroad Company, from waste, trespass or injury, and to take all lawful means to keep and hold the same for the benefit of the bonds secured by said mortgage; provided they should incur no pecuniary responsibility by any act of their attorney, etc.

Acknowledgment of the power of attorney before a commissioner for Wisconsin.

*Luther Beecher*, called and sworn as a witness, on part of garnishee and claimants, testified as follows:

The contract for building the Mineral Point Railroad was originally made with Alvan Wilkins; he failed, and I took the contract from him, and subsequently contracted directly with the company; I commenced on the road about 1st of June, 1856, by bargaining for iron in Philadelphia; I bought one thousand tons and shipped it to Chicago, and then to Warren; I was engaged in constructing the road until about the 2nd July, 1857; about the 1st June, 1856, I had fifty or sixty men on the ground ready to lay the track; I commenced at Warren, Illinois; I was there and set the men at work; about one mile of the road is in Illinois, the rest is in Wisconsin; I had the control of the road until it was finished; when it commenced running, I still had control of it; Mr. Temple had charge of the road and trains for me until February, 1857; I then changed him and put in Mr. Cobb, who managed for me until August, 1857; I knew Mr. Coman and Mr. Martin, the trustees of the bondholders, personally.

In August, 1857, I had more than half of the first and second mortgage bonds of the Mineral Point Railroad Company, and more than half of the stock of the company. I took the first mortgage bonds, amounting to $320,000, in part payment for building the road. The first interest coupons on the first mortgage bonds became due July 1st, 1856, the second, January 1st, 1857, and the third, July 1st, 1857—none of which was paid; in consequence of the default in the payment of interest, I communicated with the trustees about taking possession of the road; this was in the latter part of July, 1857, and I then owned about $205,000 of the first mortgage bonds; the rest was in the hands of parties to whom I had sold them, and who were uneasy on account of not getting their interest; I told the trustees,

that as I was the heaviest bondholder, they had better wait until I went out and learned how matters stood; I was then in New York; I went out and made an examination about the middle of August, 1857; I went over the road, looked over the books and talked with the directors of the road; they seemed to have no interest in the road; said they had built the road, and somebody else must run it; Cobb was then in possession of the road under me; I made inquiries about his ability, and was satisfied with him, and then delivered the road to him and directed him to hold it for the trustees, against the company, and all the world; I learned also that suits had been commenced against the company. I went back to New York, and told the trustees how matters stood; I explained to them what I had done, and recommended Mr. Cobb as a suitable person to represent and act for them; they approved of what I had done, and said they would send out the papers to Mr. Cobb; both Mr. Coman and Mr. Martin approved of what I had done.

Mr. Cobb continued to hold the road as agent for the trustees; he made his reports to me, as he had done before under me, and I placed these reports before the trustees, either verbally, or by showing the report, almost every month. Towards the last part of the time, the reports were made to the attorneys of the trustees, who, Mr. Coman said, were paid for attending to the business; and he himself declined to have much to do with it personally, unless paid for it. Cobb continued in possession as agent until the spring of 1859, when he was appointed receiver, and took possession of the road in that capacity. Prior to that time, he had reported to me, and through me, to the trustees. He then reported to the attorneys of the trustees directly. I have been familiar with the business of the Mineral Point Railroad Company for five or six years. The company has never had possession of the road. The place of business of the company was at Mineral Point, Wisconsin; I think the law so required. The company was organized under a law of the State of Wisconsin.

The charter of the company was here offered in evidence, and sections one and two of the original law, and section five of an amendment thereto, approved March 7th, 1853, read to the jury.

Section 1, appoints certain persons commissioners to open books and receive subscriptions to the capital stock of the Mineral Point Railroad Company, and provides the manner of doing it.

Section 2, fixes the capital stock of the company, amount of shares, and provides, that when one thousand shares are subscribed for, and five dollars paid in on each share, the subscribers to the stock and their associates, etc., shall be a corporation,

etc., under the name and style of the Mineral Point Railroad Company, with all the usual provisions and incidents of a corporation, etc.

Section 5, of the amendment aforesaid, authorizes said company in its corporate capacity, to borrow any sum of money from any person or persons, etc., at any rate of interest that may be agreed upon, and to make, execute and deliver "all necessary writings, notes, bonds, mortgages or other papers and securities, in amount and kind as may be deemed expedient by said corporation, in consideration of said loan, or in the discharge of any liability incurred in the construction, etc., of its road, etc."

I have had desk room in different offices in New York city since 1856; I did not raise money on the paper of the Mineral Point Railroad Company, on or after November, 1857. In the fall of 1857, I took to New York some paper signed by the officers of the Mineral Point Railroad Company, to renew some old paper of the company. The amount may have been from $65,000 to $70,000. Some of it went to George Ackerman. I think he filled up the paper in his own handwriting; at one time about $8,000, and at another time from $25,000 to $30,000; I can't now tell to whose order these drafts were made; I have not seen them since 1857. I think I have indorsed drafts signed by Parley Eaton. I know nothing of any judgments on drafts of the company indorsed by me. Originally I let Mr. Ackerman have some such paper to be filled up by him; he said he wanted it to use. I let him have the paper above referred to, to renew the old paper, which he had taken and used. I did not borrow a dollar of Mr. Ackerman to use on the Mineral Point Railroad, after August, 1857. I always supposed there was about $30,000 of the paper in his hands; I now suppose there was more of it. My contract with the Mineral Point Railroad Company is not with me; I think it is at Detroit.

The first I knew of the proceedings in Wisconsin, under which Cobb was appointed receiver, was by letter from the trustees, stating that they had been called upon by holders of the first mortgage bonds, to the amount of $165,000, to commence the proceedings; and that Foster and Thompson, of New York, were designated as attorneys. They, Messrs. Foster and Thompson, prepared the papers and sent them to attorneys at Janesville, Wisconsin. I was informed, and always supposed, that a majority of the bonds were represented in these proceedings.

By my original contract I was to have possession of the road until September 1st, 1857; I did not then surrender the road

to the company, because I had previously delivered it over to the trustees; from February, 1857, till August, 1857, Cobb reported to me as my agent, but the expenses were larger than the earnings of the road; I think he continued to send me monthly statements until May, 1859, and that he has continued to send me a synopsis of the reports down to the present time; the company never did run the cars.

In September, 1856, I think there was a mile of the road in use, and the cars of the Illinois Central Railroad Company ran over to carry iron; in November, 1856, about eight miles of road was done, and freight was conveyed over it so far as any was offered; do not know whether anything was paid; in June, 1857, both freight and passengers were conveyed over the road; I supposed they were charged. for; my directions were to run the road and collect reasonable pay.

No part of the sinking fund was ever paid in by the company; the trustees did not make any settlement of the moneys in the hands of the garnishee, for the reason that the companies were understood to be short of funds; they did not know either the amount in the hands of the garnishee, as no statement had ever been made, and it was understood, and supposed, that the amount accrued was not sufficient to pay one set of coupons; it was generally understood that no money had accrued until 1858; and it was spoken about very soon after the default in payment of interest due, in July, 1858; and, also, there was some talk about it after the default in January, 1858; I think Mr. Coman talked of coming out in 1858; but it was ascertained that the money accumulated was not sufficient to pay one set of coupons; he said he must be paid for coming, and upon learning the facts, he did not come, but left it with the attorneys to manage; the garnishee proceedings in Chicago, and some proceedings of a Mr. Keep, who was a creditor of the company, in Wisconsin, hastened the foreclosure proceedings.

On the part of the garnishee and claimants, was next offered in evidence, an act of the legislature of the State of Wisconsin, entitled "An act concerning railroads," approved October 10th, 1856, and sections 1, 2, 3, and 4, were read to the jury.

Section 1, provides that any railroad company may borrow money at such interest, and on such terms, as may be agreed upon; and may execute one or more trust deeds, or mortgages, or both, as occasion may require, on their road, etc., for the amount borrowed or owing by said company, and may make such provisions, in such deeds of trust, or mortgages, for pledging or transferring their railroad track, right of way, depot grounds, rights, privileges, franchises, and immunities, etc., in any manner whatever, as security for any bonds, debts, or sums of money,

secured by such trust deeds or mortgages, as they shall think proper; and further provides, that in case of any sale, under said deed of trust, or mortgage, the purchaser shall acquire and exercise all the franchises, etc., of the company, and may organize anew, under the same, or any other name.

Section 2, provides that the rolling stock of railroad companies shall be fixtures; and that such rolling stock, and all subsequently acquired right of depot grounds, etc., shall be subject to the lien of such trust deed, or mortgage, in the same manner as the property owned by the company at the date of such deed, or mortgage. That such deed of trust, or mortgage, and any release or satisfaction thereof, may be recorded in office of secretary of state, with the same effect as though recorded in the several counties through which the railroad passes; and such record shall be evidence and notice to all persons, in the same way as though records thereof were made in the counties.

Section 3, provides that any railroad company may annually, or oftener, as its board of directors shall deem expedient, set apart and appropriate a sum of money, not exceeding fifty per cent. of its net earnings, as a sinking fund, to pay off or reduce its indebtedness, accruing in the construction of its road, etc.; and the same so set apart shall be applied in retiring or paying off its bonds, etc., as its board of directors shall deem expedient.

Section 4. "That all mortgages or trust deeds heretofore executed by any railroad company, are hereby declared to be included within, and subject to the provisions of this act, as fully and effectually as if its provisions had been incorporated in its charter prior to, and at the time of the execution of said mortgages or trust deeds. *Provided, however,* that such railroad company shall first accept of the provisions of this act, by a resolution of its board of directors, and shall cause a copy thereof, under the certificate of its secretary, with the corporate seal attached thereto, to be filed in the office of secretary of state."

There is a further provision in this section, that it shall not affect any liens upon the property of railroad companies, acquired subsequently to the execution of their mortgages or deeds of trust, and prior to their acceptance of the provisions of this act, and the filing of such acceptance in the office of the secretary of state.

The next evidence introduced on the part of the garnishee and claimants, was an exemplification, under the great seal of the State of Wisconsin, of a resolution of the board of directors of the Mineral Point Railroad Company, passed June 6th, 1857, accepting the provisions of the act of October 10th, 1856, above set forth, and of the certificate of the secretary of said company, under the seal of the company attached, the secretary

of state certifying that the same was filed in his office, June 8th, 1857, and duly recorded in the book kept for that purpose.

The garnishee and claimants next offered in evidence, and read to the jury, original deed of further assurance, dated June 6th, 1857, executed by the Mineral Point Railroad Company, to Martin and Coman, which is set out in the answer of the garnishee as "Exhibit C."

The plaintiff then offered in evidence, transcripts of two judgments in the Supreme Court of New York, against the Mineral Point Railroad Company, one in favor of William Menzies, and the other in favor of George Ackerman, purporting to have been upon certain obligations of the said company, made by Luther Beecher, vice president of said company, and indorsed by him.

The foregoing is all the evidence; and the counsel for the garnishee and claimants thereupon asked the court to instruct the jury as follows:

1. That if the jury believe, from the evidence, that the funds in question, alleged to be in the hands of the garnishee, the Galena and Chicago Union Railroad Company, accumulated under, and arose out of the contract made by and between the Mineral Point Railroad Company, of the one part, and the Galena and Chicago Union Railroad Company, and the Illinois Central Railroad Company, parties of the other part, bearing date the 10th day of October, 1853, and given in evidence. And if the jury also believe, from the evidence, that the Mineral Point Railroad Company made default in the payment of interest, provided to be paid in and by the deeds of trust to Coman and Martin, set out in the answer of the garnishee, and given in evidence, or made default in the sinking fund, also provided for in said trust deeds; and that such default occurred prior to September, 1857; and that the trustees, Martin and Coman, by reason of such default, took possession of the road and property of said Mineral Point Railroad Company, under said deeds, and continued such possession during all the time when the funds in question were accumulating, then the jury will find the right to said money in the said Martin and Coman, and that there is nothing due from the said garnishee to the Mineral Point Railroad Company.

2. If the jury believe, from the evidence, that the money in controversy accrued under the contract between the Mineral Point Railroad Company, and the Galena and Chicago Union Railroad Company, and the Illinois Central Railroad Company, whilst the Mineral Point Railroad was in the possession of, and operated by Martin and Coman, or their agents, in pursuance of the power conferred on them by the deeds offered in evi-

dence, then said money belonged to the said Martin and Coman, and the jury must find the issues on the interpleader for them.

3. If the jury believe, from the evidence, that Martin and Coman took possession of the Mineral Point Railroad in July or August, 1857, in pursuance of the deeds of trust offered in evidence, and on account of default in the payment of the interest on the bonds secured by said deeds, then, whilst they so remained in possession and use of said road, the earnings thereof belonged to said Martin and Coman, to be applied by them in pursuance of said deeds.

4. If the jury believe, from the evidence, that the funds garnisheed, and in question, are a part of the $56,000 guaranteed fund mentioned in the deed of trust given in evidence, then the jury are instructed that such deed of trust is effectual in law to transfer the right to said fund to Martin and Coman, the grantees in said deed.

5. It was not necessary that the garnishee should be notified of the assignment of the money in its hands, before the service of the process upon it, in order to make such assignment effectual against the plaintiff.

6. The plaintiff, by his garnishee proceedings, only acquires the rights of the defendant, the Mineral Point Railroad Company, in or upon the money or property in the hands or possession of the garnishee; and if the jury believe, from the evidence, that the money in controversy had been transferred by the Mineral Point Railroad Company, so as to vest in the claimants, Martin and Coman, the equitable right to it, as against the Mineral Point Railroad Company, before the service of process in this case, then they must find for the claimants upon the interpleader, and in favor of the garnishee.

7. An absolute assignment of money, in the hands of third persons, is an authority to the assignee to receive the money so assigned.

8. It was not necessary for the claimants in their interpleader to set out the title by which they claimed the money in controversy, and having claimed the money generally, they may establish their right to it by any competent testimony showing such right.

9. The jury are instructed, that no written authority was needed to constitute Mr. Cobb the agent of Martin and Coman; and if the jury believe, from the evidence, that Luther Beecher, having possession of the Mineral Point Railroad Company, as contractor, in July or August, 1857, and at the same time being a holder of the bonds of the Mineral Point Railroad Company, secured by the deed in evidence, delivered said road to Mr. Cobb, for the trustees, in said deed, and the said trustees, on

being advised thereof, immediately ratified and approved of said Beecher's acts in the premises, then the appointment of said Cobb, so made and ratified, was equivalent to an actual original appointment by said trustees.

10. The deed of trust offered in evidence, conveyed to the trustees the contract with the Galena and Chicago Union Railroad Company, and the Illinois Central Railroad, offered in evidence, and all indebtedness of said companies under it in trust for the purposes specified in said deed.

11. The word "premises," as used in the clause of the deed of January 1st, 1856, conferring the power to take possession and sell, upon the trustees, included all the property described in the granting clause of the deed, and does not mean simply the railroad and rolling stock of the company.

The court gave the 6th, 7th, 8th, 9th, 10th and 11th instructions, but refused the 1st, 2nd, 3rd, 4th and 5th instructions aforesaid ; and to the refusal of said last mentioned instructions, the garnishee and claimants respectively excepted.

The court, of its own motion, then gave the following instructions to the jury :

1. The jury are instructed by the court that, assuming that by the terms of the trust deeds in evidence, the income derivable under the contract with the Galena, and Illinois Central Railroads, passed to the trustees, Martin and Coman, yet it nevertheless passed subject to the right, on the part of the Mineral Point Railroad Company, to collect, receive and dispose of any moneys due, or to grow due, under said contract; and the court instructs the jury, as matter of law, that an assignment of a debt or chose in action, or other property, with a reservation to the party making the assignment, to collect, receive or sell the same, is a fraud at law ; and that nothing passes by it, as against attaching creditors, unless actual possession of the debt is obtained by the assignee under his deed or notice to the debtor, that the right of the assignor to control the debt has ceased by virtue of the deed, before the service of the process upon the garnishee.

2. And therefore, if the jury find, from the evidence, there was a default, but that no possession was taken under the deed by the trustees, or the debt in anywise reduced to possession by them till after the service of the garnishee process in this cause, then they will find that the property in the said debt was subject to the process, and that the trustees acquired no rights by the deed as against attaching creditors of the Mineral Point Railroad Company.

3. And the court further instructs the jury, that if they find, from the evidence, that the trustees actually took possession

APRIL TERM, 1861.    147

Galena & Chicago U. R. R. Co. *v.* Menzies.    Martin et al. *v.* Same.

under the trust deed, before the service of the process upon the garnishee, but that no notice was given to the Galena Railroad of such possession, and that by reason of default in the payment of the interest or principal of the bonds secured by the trust deed, the said Mineral Point Railroad Company had ceased to have any right to control or collect any money due to it, then the jury will find that the said debt was subject to the plaintiff's claim, in the hands of the Galena Railroad, and that the trustees have no right as against them.

To the giving of said instructions, and each of them, the garnishee and claimants separately excepted.

The jury retired to consider their verdict, and returned for further instructions, and were thereupon further instructed by the court as follows:

" Under the third of the instructions, entitled ' by the court,' the jury must find that actual notice was given by the trustees of their possession and of their rights under the deed, not in writing merely, but notice by an agent would be sufficient. Mere possession of the road, unaccompanied by any other act to show notice, would not be sufficient."

To the giving of said instruction, the garnishee and claimants respectively excepted.

Assignment of errors by Galena and Chicago Union Railroad Company:

1. The court erred in refusing the 1st, 2nd, 3rd, 4th and 5th instructions, and each of them, asked on behalf of the said company.

2. The court erred in giving to the jury the instructions numbered 1st, 2nd and 3rd, entitled " by the court."

3. The court erred in giving his 4th and last instruction to the jury.

4. The court erred in overruling the motion of said Galena and Chicago Union Railroad Company, to set aside the verdict of the jury, and for a new trial.

5. The court erred in rendering judgment against said company.

Assignment of errors by Coman and Martin:

1. The court erred in refusing the 1st, 2nd and 3rd instructions, and each of them, asked for on behalf of said claimants.

2. The court erred in giving the 4th and last instruction to the jury.

3. The court erred in overruling the motion of said claimants, Martin and Coman, to set aside the verdict, and for a new trial.

4. The court erred in rendering judgment against the claimants, Martin and Coman, and in favor of the plaintiff below.

Scates, McAllister & Jewett, Attorneys for all the Appellants.

E. S. Smith, and E. A. Storrs, for Appellee.

Walker, J.  The money sought in this case to be subjected to the garnishee process, was accumulated after the order of the directors, in January, 1856, appropriating the $56,000 guaranteed to them by garnishee and the Illinois Central Railroad Company, for the payment of the interest, and a sinking fund for the payment of the bonds secured by the mortgage, or deed of trust, to Martin and Coman.  And it was earned by the road, and became due to the defendant below, after the execution of the deed of trust; and if it was embraced in and passed by that instrument, then it was properly the money of the trustees for the use of the bondholders, and the garnishee should have succeeded.  Whilst, if that fund did not pass by that instrument, or its appropriation for the payment of the interest on the bond was in operation, the finding of the jury was fully warranted.

It appears from the evidence, that the road during the time this fund was accumulating, was in the possession and control of Martin and Coman, by Cobb, their agent.  Under the resolution of the board appropriating this fund to the payment of interest upon the bonds held by Martin and Coman, followed by their possession of the road, and their receipts of the funds, there could be no question that they would be entitled to retain this fund, and to apply it according to the provision of their deed of trust.  And as the garnishee can avail himself of any equities that may exist, to exonerate him from paying the money, if it can be made to appear that Martin and Coman had an equitable right to this fund, it would constitute a complete defense against the garnishee process.  In this case, it would seem that the right of Martin and Coman to recover against the garnishee was complete, both at law and in equity.  An action for money had and received could no doubt have been maintained, or it could have been recovered on a bill in equity.  It was pledged to their use, and when received in equity became theirs.  And if their remedy was complete for its recovery, appellee could not have the right also to sue and recover the same fund; if so, it would render the garnishee liable to a recovery by, and to a payment of the same fund to both parties.

But even should we be incorrect in this conclusion, the garnishee had a full and complete defense under the deed of trust. The defendant below, before this fund accrued, by its deed to Martin and Coman, had conveyed to them, to secure the pay-

ment of the principal and accruing interest on their bonds, all of its corporate property, tolls, incomes, issues, profits, rights, credits, and franchises.   Now, this fund must unquestionably be an income of this road.   It was not a fund, then, accumulated and in possession of the company.   It came to them after the mortgage was executed, and was as much an income as if it had been produced by the earnings of the road in any other mode. It is true that there is a reservation in the mortgage, that the mortgagors should have the right to collect money due on subscription, or otherwise.   But there is no pretense that this controversy was for money due on stock subscriptions.   It is, however, insisted, that as the reservation was for the collection of money due otherwise than for subscriptions, that this fund was not included in the property thus pledged.   This could not have been the design of the parties, however, the income and profits had been expressly enumerated, and this sum was not then due. But the parties must have designed to reserve the right to the mortgagors to collect money due on stock subscriptions, and such other accounts or contracts as had not been enumerated in the deed.   This construction would seem to be the reasonable and natural intention of the parties, and frees the reservation from all doubt and uncertainty, whilst the other would leave it uncertain as to the intention of the parties.   This was not, then, a debt, nor was the money due, but it was earned and produced by the use of the road after the mortgage was executed, and could not have been designed to be embraced in the reservation or exception.

This fund was produced by the agreement between defendant below and the appellant and the Illinois Central Railroad corporation, and grew out of the transportation of freight and passengers by defendant below, in pursuance of the agreement. By this arrangement, a large portion of the income of the road was produced, and it was in the nature of income on freights, and not of indebtedness.   These other companies were not owing the defendant anything at the time, and if they were, that indebtedness did not pass under the mortgage, but only the future increase.   Then, if the interest was not paid upon these bonds as it fell due, and the evidence seemed to show that it was not, this fund was liable under the mortgage for its payment, and Martin and Coman had a right to recover and so appropriate it.   The court erred, therefore, in refusing to give appellants' first, second, third and fourth instructions.

The judgment is reversed, and the cause remanded.

*Judgment reversed.*